v. United States of America et al. Mr. Colchin for the balance, Mr. Goldman, Mr. Koppel for the appellate. All right, Mr. Colchin, good morning. You may proceed. Good morning, Your Honor. I just want to make sure I'm not having a technical problem. I don't see you, but I don't know if that's intentional. You don't. Go ahead. Okay. Your Honor, Mr. Goldman and I have in a general way divided the topics we're going to address, and I'm going to jump right to the later topics. So the government puts a huge emphasis on the word available, the words the funds available to distribute, and they read into the word available a whole lot of discretion that they and I think that may be the core of this issue here. The word funds available, as used in the statute, does not mean that the special master has discretion to simply decide not to make a distribution. The mandate of the statute is that there should be an annual distribution whenever there are funds available. There is a trigger amount that if there's a hundred million dollars in the fund or more, a special master has to be appointed, and there's a timeline of what the special master is supposed to do. The special master is supposed to get appointed, review any claims that haven't been ruled on as to eligibility, authorize payment, report to Congress on the payment, and finish the appointment within a year. And then there's not supposed to be another special master unless and until there's a sufficient amount. Mr. Tolture, I thought your, excuse me, I thought your argument was that they had to pay on January 1st. Well, that's right. There's two aspects to my argument, which to tell. Well, but that is one of your arguments, right? Yes. So, well, did you, was it your 28th day letter this morning that submitted this section? I think it's HI of the statute. About the congressional report? Yeah. I mean, this, maybe I'm misreading it, but this seems to support the government's view. Because it says, it says that, first of all, it very clearly indicates, as the government argues, that there's a difference between the word authorization and payment. That's the number one. But also, you're right. It requires a congressional report within 30 days. But that report is about payments that have been made and not made, which suggests that there is no deadline. Your Honor, I can address that. I know exactly what you're thinking, and I think you're misapprehending it. The enumerated things that are supposed to be in that report, addressing eligible claims that have not been made, is because nobody's getting their full claim paid in a given year. There are $10 billion worth of claims that have been submitted to the fund, and the money is divided up pro rata. So what's being reported to Congress is, we've had this many claims, we've paid out this many, and we still owe, in future years, such and such an amount of money. That's the part of the congressional report that refers to claims unpaid. What an earlier section of that congressional report says is that the special master is supposed to report, but within 30 days after making payments, is supposed to report about the payments that were made, and then what remains unpaid in the fund. But the point is that the special master is supposed to be appointed for at most a year. There's supposed to be a beginning, a middle, and an end. The beginning is, there's $100 million. We've got to appoint a special master. The special master is supposed to make whatever rulings need to be made, whatever claims have been submitted since the last time there was a special master, approve or disallow individual claimants, and authorize payment. That's where we come, that's where we come, the real semantic game. The government says authorized payment means just say, okay, you can pay, but doesn't mean actually pay. We contend that for the special master to authorize payment and then report to pay, and it's supposed to be paid by the deadline set in the statute. Otherwise, it's- So tell me what your, please tell me what your definition of authorize is, because I've seen sort of different ones through your brief, and I'm trying to figure out what you, tell me what you define authorize as under this statute. Authorize or authorize payment. Because you can authorize payment. Authorize payment, that's your key phrase here. Authorize payment means pay. Black and white, it means pay. If it doesn't mean pay, we've got nothing. There's no mechanism in the statute for the victims to ever get their money. Elsewhere in your briefing, you had indicated that you thought authorized payment might mean when your client got his letter saying, here's how much money you're going to come in the future payments. That's the government's argument, and I argue for- No, no, no. I'm not talking about eligibility. That's their argument. I'm talking about the dollars you're going to get. We do not contend that- We disavow that argument now. Well, we do not contend that that satisfies the requirement of authorizing payment, because there's no payment involved. That's telling somebody how much they might one day expect to get if payment is ever made. But you know what? Here's a theoretical way, you know, if they never make payment, so there will never be a payment. And at the end of the- Well, that, I mean, that's what mandamus is for. I mean, there's ways for the courts to deal with that. Can I finish my question, please? There are lots of statutes that don't have deadlines that courts will read into a statute. The question that Judge Millett is asking you is, the government says that the word authorized and the word payment mean different things. And and that seems to be right. The way the government works is an agency authorizes a payment, it authorizes it, and then the treasury or another agency actually pays it. They're two different acts. And that's what this language seems to say. Here you have the fund is, our statute, the fund is in the treasury. It's not another agency. It's a ledger sheet in the treasury. And the special master is the one who's supposed to authorize the payment. And if we leave it at that, Your Honor brought up the word mandamus. But if we ever did a mandamus, they'll say what they're saying now, which is that the special master has discretion. And you know what? It's ludicrous. If the statute said what you said, it would just say simply, the government, the special master must pay by January 1. That's what it would say. Also, let me ask you this. The government makes an argument in their brief that if the deadline was what you suggest, that the whole thing would be pretty much unworkable. And you didn't respond to that. They said just the system with all the steps that have to be taken in the program and all that, that it just couldn't happen by January 1. What's your answer to that? My answer is, that is a parade of horribles argument that the government conjured up. And it's just not clear. Well, it's not a parade of horribles. They're saying it would be impossible for them to do this. That's what they're saying. Claims, all claims have to be approved. There is a time period for the special master to rule on them. If a claimant doesn't like the ruling, there is a procedure for an appeal, which is just an appeal to the special master. And if that's completed before the distribution, fine. If it's not completed before the distribution, so the distribution can go on without that claimant, and that claimant will be part of the following year's distribution. There's nothing that says that a person who has a pending, who's been denied and has a pending appeal, that everyone has to wait for them. All the other stuff that they talk about, they need to hire an economist to calculate the pro rata distribution. It's nonsense. They used a spreadsheet. They put in everybody's claim amount and the spreadsheet calculates what pro rata is. They have five justice department staffers assigned to them. They have a special master and there's no reason that they can't complete the very mundane procedure of figuring out how much money we have and multiplying it by some percentages and mailing out checks. And in fact, they've done it in past years. Judge Tatel, have you got your answer? Yes. Can I ask just one more question, Judge Henderson? Sure. On your complaint, I'm just trying again to pin down this authorize. In paragraph 75, you talk about actually transmitting the money. That's the definition you've articulated here. Enabling the transmission of money, directing anyone to transmit money, or authorizing money to be transmitted. I want to make sure I'm understanding your position. You're now focusing on that first one. Authorized payment means actually transmitting the payment. Correct. There's a reason it has to be. Okay. I'm just clarifying your language. I had one other question. If there were $1 in excess of the $100 million balance in the fund, would the special master be obligated at that point to do a distribution? Well, your question is a little confusing. If there's $100 million, that's a substantial amount. I know. I said if there's $1 in excess of that, so $100 million and one. Excuse me. If there's $100 million and $1, is a special master obligated to make a distribution at that point? Of $100 million and $1? Yes. $100 million is not a threshold for distribution. It's a yes or no answer. If it's $100 million and $1 under your theory, is the special master obligated to make a distribution at that point? The special master at that point is obligated to set aside reserves for whatever known quantities need to be reserved for and to distribute the balance. If there's $100 million and $1, if there's set aside whatever reserves for pending claims or whatever things need to be reserved for and distribute the rest. The statute says distribute annually. I know you're trying to get me to talk about if there's $1 and that has to be distributed. I'm not trying to get you anything. I'm just trying to ask you a question to understand. I'm having trouble with your question because you're making the fact like $1 more than $100 million is a significant issue. If there's $100 million and $1, I think you mean to say if the $100 million is spoken for. That's not what I mean to say at all. Okay. If there's $100 million and $1, then yes, the special master is obligated to make a distribution. Thank you. Mr. Tolton, you're way over your time. Mr. Goldman. You need to unmute yourself. Thank you. May it please the court. My name is Jerry Goldman. Thank you for the opportunity to be able to participate in this appeal on behalf of the 9-11 victims. I'm going to be speaking about the issue of the 25% whether or not and when that 25%, the difference between 50-50 and 75-25 applies in this case. We suggest that the plain language of the statute, the Clarification Act, which was put into effect to protect the 9-11 plaintiffs from dilution, add them into the program, and then make sure there was sufficient funds so they'd have some sort of meaningful compensation, was designed to operate the way the statute in its express terms states. Its express terms, the Clarification Act, which was a technical correction, simply changed in this regard one word, 50-75. If Congress wanted a different effective date for that provision, it would have modified that effective date in that provision as it did with other provisions in the Clarification Act, such as attorney fees. Let's just start with the plain language of the Clarification Act. It says this section and the amendments made by this section. Now, add 25%, right? That's one of the amendments. It says this section and the additional 25% shall take effect on the date of the enactment of this act, November 1999. It seems clear that the amendment, the 25% amendment becomes effective on the date of the enactment of the Clarification Act. I beg to differ, Judge Henderson. The statute itself... I'm sorry about that. The statute itself, which is reproduced in the appendix... Well, I just read you. Just stick with the language that I just read to you. Correct. It says that the 25% becomes effective on the date of the Clarification Act. That's what it said. I respectfully disagree, Your Honor. It doesn't say that it becomes effective on the date of the Clarification Act. What it says is, in that particular portion, that it simply changed the percentage, and then the rest of that sentence... Wait, wait. I still don't understand. It says, just help me with the language, shall take effect on the date of the enactment of this act. Correct. The enactment of this act, I suggest, refers to the original act, the V.S.S.T. Act from 2015. In other changes in the Clarification Act, they refer to the date of the Clarification Act by date, or they refer specifically to the Clarification Act. What I suggest is, when Congress uses specific terms, it's our obligation, justice, the courts, and what have you, to follow those terms of Congress. Can I just clarify your answer, Judge Tittle? When you're saying that the word this act, the this, T-H-I-S, in that Clarification Act, didn't refer to the Clarification Act. That, in fact, referred to the original statute. In part, yes, and I'll go further than that, Your Honor. The actual terms in the statute doesn't use the word act. It just changes the word by striking one half and inserting 75%. That's what the law passed by Congress said, and then it had to be inserted into the original 2015 act. But that was the, that was the, quote, amendment that became effective. The change from 50 to 75 was the amendment, quote, the amendment, right? Correct? Correct. Okay. Correct. But the exact words by Congress, unlike, for example, when it changed the formula for attorney fees. Unlike, for example, when it allowed spouses, children, and estates to participate. In all of those, they used the specific reference, as Your Honor talked about, the reference to the Clarification Act. In this particular provision, it didn't do so because it makes sense. They needed an influx of money because of the numbers involved. The 9-11 victims were 80% of this fund. Well, this, the government points out that this will increase the amount of money. It will increase it by 25%, just not as much as if it was retroactive. So, in other words, Congress is accomplishing its purpose. Congress wanted to increase the amount of money available for victims, and it did it. Your argument is that that increased should be retroactive. So, it's perfectly consistent with Congress's purpose. I'm suggesting the word effective rather than retroactive. What happened? Is victims received? Can you just, just please respond to my point. Sure. You said that the government's argument is inconsistent with Congressional purpose of increasing the amount of money available to victims, and the government's interpretation does do that. I suggest it does not because victims received 4.82% in the prior year and dropped down to less than 1%. But from the effective date of the Clarification Act onward, there's an additional 25%, right? From the effective date of the Clarification Act, there will be additional funds if there are future rounds. That is correct. That's my point. All right, if there are no more questions. If Judge Taylor's done, I had one more question, and that is, it's a pretty established rule of statutory construction for separation of powers reasons that courts will not construe a statute to take money out of the Treasury unless Congress has been said so specifically. And we know from E-5 in the statute, 2014 E-5, that when Congress wants to appropriate funds from the Treasury for this statute, it says so in plain terms. There is appropriated to the fund out of any money in the Treasury. That was the initial distribution. That isn't what the language that you're relying on looks like at all. And I understand your argument, right? If someone doesn't pick up the Clarification Act and see that effective date and you just read the statute, I understand your argument. But there is the Clarification Act. There is a language in E-2 that says these payments are going to supposed to start at beginning December 18, 2015, which can't possibly happen with respect to the 75% rather than 50%. They can't go back. Clarification Act says you can't start until 2019, and this statute says you're supposed to start in 2015. It's an impossibility. So given that, how can we say that Congress has specifically in the text you point to or other texts you want to point me to now, appropriated funds out of the Treasury to make up that difference that you think should be made up now? I suggest the answer that is clear. We're not talking about general appropriated funds out of the Treasury. We're talking about earmarked funds coming from sanctions, forfeiture, whatever, which was separate and distinct accounts. No, but that money went into the Treasury, right? Initially, between December 15, 2015 and November 2019 of the Clarification Act, 50% went into this fund and 50% went into the Treasury. And under your reading of the statute, you say this language tells a court, you want this court to order the special master, the government to go get that make up 25%, get you to 75% for the span of four years to make it up from December 2015 to 2019, make up that, get it out of the general Treasury. I'm sorry, I'm suggesting it does not come out of the general Treasury. It comes out of this fund, these escrowed funds, these forfeiture funds that it kept in a separate- They're not escrowed. First of all, put aside the forfeiture ones because it's not all that, it's also penalties. Those aren't there. Do you have evidence that they've been escrowed since they were first paid? Well, footnote two on page 29 of the government's brief, they indicate that they were escrowed. Second- They're talking about the forfeiture, the ones that have been forfeited. I said not the forfeited ones, the penalties. Correct. So put aside forfeiture for the moment. There's been no escrow. The government indicated on footnote two that they set those funds aside. Okay. That's great. I will ask them to clarify that. Okay. And then- If that didn't happen- Oh, go ahead. You have a second. If that didn't happen, there's always this mass of funds waiting to move out. Some of it moves out to the Victims of State Sponsors of Terrorism Fund, which is for the benefit, and Congress's intent was this is for the benefit of victims of terrorism, and the rest of it, be it 50% or 25%, goes into a discretionary account, not subject to congressional action, not the general funds of the treasury, but a discretionary act of the Department of Justice. What we're saying is that mass of funds to follow the congressional intent, the goal of helping victims of terrorism, is to take precedence and use those monies in that account, be it to make up this difference and in the future to go forward. So you say there's a separate account. It's not the treasury. It's not this fund. There's another fund where- That's what it appears based on the language in the briefing and our understanding of it, that whatever is not used for this is a discretionary account of the Department of Justice. They use it to make grants and what have you. Okay. Thank you. All right. Mr. Koppel, good morning. Good morning, Your Honors. May it please the Court, I'm Josh Koppel on behalf of the United States. As relevant here, the Victims of State-Sponsored Terrorism Act made two distinct appropriations. First, in subsection E-5, Congress appropriated to the BSST Fund $1.025 billion out of any money in the treasury not otherwise appropriated, that is out of the general fund. Second, in subsection E-2A-2, Congress appropriated 50% of certain civil penalties or fines forfeited or paid to the United States after December 18th, 2015. The first of these provisions appropriates money already in the treasury. The second sets up a scheme for determining how incoming receipts should be allocated among various government funds. And because subsection E-2 is designed to allocate incoming receipts, the Clarification Act's amendment of the provision in 2019, increasing the percentage of receipts that should be devoted to the BSST Fund, necessarily only affects the allocation of civil fines and penalties paid after enactment of the Clarification Act. If Congress had intended in 2019 to allocate additional money already held by the government, it would have done so in the same way it did so in the original BSST Act, using the language of the source of ongoing funding for the BSST Fund. Subsection E-2 states that a percentage of the civil penalties and fines themselves is to be deposited into the BSST Fund. Can you respond to their understanding of your footnote, too, in your brief? They seem to think that, at least amicus, and we can't attribute it to Mr. Tolkien, but seem to think there's another fund or at least forfeiture monies just sit there year after year if unused. That's not correct. So what we're saying in that footnote is that there were two assets that had recently, prior to the passage of the Clarification Act, recently been forfeited. 50% of the funds were sent to the BSST Fund, and the Assets Forfeiture Fund staff at the Department of Justice was in the process of divvying up the other 50%, so sharing it with local partners and other federal agency partners. When this litigation was filed, the DOJ Assets Forfeiture Fund paused that process and held on to those funds in case there was an adverse judgment in this case. But that's just with regard to two particular forfeitures that comprise a very small portion of the total amount of civil penalties themselves, and were split between the BSST Fund and the General Fund. Forfeitures that went into the Treasury Forfeiture Fund, those went into the fund itself. They were spent as permitted and required by statute or rescinded by Congress. And the same with, I believe, some of the forfeitures that went into the Assets Forfeiture Fund as well. So do I hear you? So what you're saying then is that if the court were to rule that the 25% increase is retroactive, that money would have to come out of general treasury funds, right? There's no funds set aside for that? That's right. There's no money set aside for that. There's a small, very small portion, but, you know, miniscule compared to the whole. That's right. Let me pursue that issue. Go ahead. No, go ahead. I just wanted to ask you a few other clarifying questions, if I could. And would you please just go back to basics and tell us about the government's view about authorized versus payment and how this works? Just explain it to us, would you please? Sure. So when the statute creates a deadline for authorizing payment, that means that is the deadline for when the special master has to make an initial eligibility determination on all claims that have been submitted by the application deadline for that round of distributions. Well, let me just interrupt you. The plaintiff says that there's only one eligibility determination made at the beginning and then none after that. Is that accurate? That's correct. That is correct. So that means... So under your theory, on January 1st, the special master authorizes amounts to eligible claims, correct? That's right. And then the payment is made later after the prorated calculations are done. Is that the way it works? So after the special master makes the initial eligibility determination, the claimant has 30 days, if their claim has been denied in whole or in part, they have 30 days to seek a hearing. Well, the special master has to still hold hearings for those whose claims have been denied, make a final written decision as to their claims because only once all claims have been adjudicated can the prorated calculation be made. That's helpful. Okay. So I see. And then... Mechanically, once an amount is authorized and the claims hearings are completed and the special master makes the prorated calculation, who makes the actual payment? How does that happen? It comes from treasury. The funds are sent to an intermediary bank and from there, they go to the claimant's bank. Okay. So the treasury takes the authorization order from the special panel and that's what authorizes the treasury to disperse the money to the bank, correct? I believe that's right. They receive an instruction to issue. I'm not certain about mechanics of how the money moves between the treasury and the banks. All we need to know here is the special master doesn't make the payment, right? I believe that it's done by treasury. Yeah. Okay. And just one other clarifying question. Suppose the fund, this is the reverse of the question Judge Millett asked, not the reverse, same question, different numbers. Suppose the fund, after set-asides and administrative expenses, suppose the fund has $110 million. Does the special master have to distribute that $10 million? The special master then has to make a determination in her discretion whether it is if funds are available. So my question is, after deducting administrative expenses and other set-asides, there's $10 million. Isn't that the $10 million that's available? The $100 million threshold is for when the attorney general has to appoint a special master. It's not when the special master has to issue distribution. And just as the special master has discretion whether to issue distribution, whether there's $1 of unreserved balance in the fund, the special master also has that discretion at $100 million. It could be- Suppose there's $200 million in the fund. Yeah, I understand what your honor is getting at. And there very well could be a point at which the special master would have used her discretion by not issuing a distribution. That's not the claim the plaintiff has alleged here. I totally understand that. I was just trying to get you to help me understand how this thing works. That's all. But you acknowledge that there could be a point at which there is an abuse of discretion in terms of the distribution of money in the fund, right? That's right. Whether there's a distribution for that is a separate question. But at some point, that is. Yes. I just want to follow up on Judge Tatel's done. I just want to clarify one more thing. Does the special master have to keep $100 million balance there at all times? Or if there's $100 million, the special master can distribute- Let's assume there's no set aside. There's $150 million after all your reservations and all your administrative costs. So there's $150 million clear. Yes. The special master can distribute that full $150 million. There's no obligation to keep $100 million baseline in the account. That's correct. So what the special master has to keep is the amount set aside for conditional claimants and administrative expenses. The claimant piece itself is well in excess of $80 million in administrative expenses. Are there any more conditional claimants coming in at this point, or is that pretty much set? I know that there were additional conditional claimants in the third round distribution. I'm not sure whether there will be in future rounds of distribution. And then on your definition- You finish up. Go ahead. I was going to ask something different. So if you're still- Oh, okay. Well, I wanted to follow up on your position that authorized payment means that determination of eligibility. And it's a little hard to wrestle with a statutory tax because there's a whole separate provision for determining eligibility. And eligibility to receive a payment is not the same thing as authority to make a payment. So it seems a very ataxial definition. And it seems like your very eligibility letter itself, the one you sent to Mr. Braun says, you're eligible and you will be notified about the exact amount of your payment after the special master authorizes the next distribution. So the special master herself or himself has been using this phrase authorized distinct from determining eligibility. So is it really your position that you authorized payment to Mr. Braun back in 2017 when he was first, within the meaning of the statute, determined to be eligible? Or is it your position that when there was that follow-up letter shortly, a month or so before payment that says, we've determined there can be a payment, here's your pro rata share, go on the website and put in your bank account information. Which of those two do you think is the special, or some third step, special master authorizing payment? Payment to Mr. Braun is authorized when the special master determined that his claim was eligible for payment. And that's the only, that understanding of authorized payment, which to be clear is different from authorizing a distribution, but that's the only, that construction of authorized payment is the only way to harmonize the disparate provisions of the statute. So take the third round distribution. Congress said that the application deadline for the third round distribution was 90 days after the effective date of the Clarification Act. And then the special master should authorize payment 90 days after that. So there's 90 days between the application deadline and authorizing payment. At the same time, other parts of the statute provide that after the special master makes an initial eligibility determination, the claimant has 30 days, if their claim is denied, to seek a hearing. I understand, but wait, if I can back you up there, as Judge Taylor pointed out early on, that the provision about a report to Congress envisions the payments can be made while certain claims are still getting sorted out, right? Because it says, tell us which payments have been made and which ones have not yet been made. It seems to be very strange to say authorized payment is the same thing as determined eligibility, as opposed to, you know, what do you call that letter when they say, here, you're going to get this payment, here's the dollars you're going to get. That's a notification of the amount that a claimant is going to receive in a given round of distribution. And then after that, what does this, follow up on Judge Taylor's question, after that, the special master must sign something, do something to inform Treasury that it's time to make payments and here's the amounts, right? That's right. Right. Why isn't that the most natural, whatever that is, whatever paperwork that involves, why isn't that the most natural reading of authorized payment? So again, that doesn't harmonize the disparate provisions of statute because there's no way that the special master could have reached that point within 90 days, 90 days after the application deadline. That happened for a third distribution. At some point, I put aside the deadlines. At some point, the special master had sorted enough things out that she then said, I think it was she at that point, she then said in whatever form she did to someone at Treasury, here's who's to get paid and here's how much they are to get. Correct? That happened. That event happened. And that is not the most natural meaning of authorizing payment when she authorized payment from the Treasury to the individuals? No, Your Honor. I think that there are a number of ways that a person could interpret authorized payment. The one, again, that harmonizes the various deadlines in the act, the only one that would have been possible within the 90-day deadline to authorize payment is to initial eligibility determination. I'm sorry to interrupt, but I thought I was following you until you said what you just said. The plaintiff received his eligibility letter years ago, right? That's right. So the only thing that has to happen for him to get future payments is two steps. Number one, the special master authorizes payments from a fund. And then after all the hearings are over and the pro rata calculation done, he gets payment, right? That's right. Do I understand that? So authorized, does it mean eligibility? The authorization is made to people who have previously been determined to be eligible, correct? I'm sorry, I'm not sure I answered that. The authorization that occurs on January 1 for a group of claimants, those are authorizations for claimants who have been determined to be eligible. So any claimant receives authorization- Take the plaintiff, not a new claimant. I don't mean a new one. I mean, take plaintiff, for example. He was determined, the plaintiff in this case, he was determined to be eligible years ago, correct? Along with a lot of other claimants, right? Thousands of others. That's right. Now, with respect to that group of people, what happens on January 1 is if there's money, they get first an authorization, correct? So their payment was already authorized. Payment to their claim was already authorized years ago. January 1 sets the deadline for when the special master has to authorize payment for any remaining individuals who are going to participate in- But wait, payment can't be authorized. The special master cannot authorize payment as a matter of law just by finding people eligible. Special master also has to find there's enough funds, putting aside reserve funds, there's enough funds to do this. And if your position has been made that discretionary judgment, that has to happen too. Eligibility does not authorize payment. There has to be a determination that a payment will be made. And then there has to be a determination that there's what the amounts are going to be because it has to be done pro rata. All of that has to be done before payment is authorized. Just being eligible does not you could be eligible and just imagine there was just never enough money in the fund. That's no, no one's payments authorized. Mr. Koppel, let me weigh in here. And that is, I don't see why there's a difficulty in differentiating between authorization and expenditure. And in fact, the sunset provision actually says, divides them effective on the day after all amounts authorized to be paid to be paid are expended. So there is the action of authorization. And then there is the action of cutting the check of expending the funds. I don't see why you're not making that argument. We absolutely agree with that position, Judge Henderson. That's absolutely right. Authorizing payment does not mean issuing payment. The best way to understand the term authorized payment, the way that the SST fund has in the special master have understood in the past and have reported to Congress, this understanding is that the authorized payment on a claim, when the special master makes a determination of the eligibility of that claim, payment isn't actually issued until the special master determines that there are funds available. There's money available in the SST fund, authorizes the distribution and performs the pro rata calculation. The special master authorizes payment on a claim when she determines that the claim is eligible for payment. That's how, that is again, how the special master has applied. This has interpreted and has effectuated the statute in the past. Congress understanding that and they understand this because they received the reports from the special master that lay that out. They use that same term authorized payment in the clarification act, thereby adopting or ratifying this under the SST fund's construction of the statute. All right. Can we go back to just the language of the statute here? So it says January 1st and second calendar year begins after the date of initial payments. That's we are now, right? Okay. Funds are available in the fund. Special master shall authorize additional payments on a pro rata basis. So on January 1st of this year, the special master authorized additional payments on a pro rata basis, right? In this particular year, the special master determined there weren't sufficient. I'm sorry. Good correction. Let's assume there was money. Okay. Yeah. On January 1, the special master would authorize additional payments on a program. So what would the letter say? It would say what you are, you'll get another payment this year. So the special master announces that there will be a distribution this year. And by January 1st has to issue a decision on the application of any claimant who has submitted his or her claim by the deadline set by either statute or the special master. What will that letter say on the January 1? Will it say you will get a pro rata? Is that what it will say? It will say that your claim has been deemed eligible or your claim has not been deemed eligible. You have 30 days to seek a hearing. Okay. And the pro rata calculation is made later, right? That's right. So then much there is. Okay. That's right. So then the claimant has 30 days to seek a hearing after the hearing, the special master has 90 days to issue final written decision. Only once all claims have been finally decided, can that pro rata calculation be performed and then payments can issue. Okay. Let me ask you one other question that relates to the blizzard of 28 J letters we got today. And that has to do with whether or not the attorney general has in fact appointed a master. You say the master was extended, right? There is a master now, correct? That's correct. The special master's term has been extended for an additional year. What is your view of what we should do with this 28 J letter from the plaintiff about this argument in the district court was this claim was moot because the district court said this is a claim that was the district court considered to be moot, correct? That's right. And plaintiff has forfeited and waived any challenges to dismissal this claim seeking the appointment of a special master. He didn't argue an exception to mootness in the district court and the court of appeals here, he actually said he confirmed, he admitted that the claim was moot. So if a new injury has occurred, plaintiff has to file a new complaint. Okay. That's all. Can I ask one follow-up on that? Yeah. One follow-up on that was the special master's term extended by the attorney general? My understanding is that it was not done by the attorney general over the weekend since plaintiff first raised this issue. I haven't been able to determine definitively which official it was that extended the special master's term. The justice department hadn't figured it out beforehand? The special master's term had expired? A justice department official had extended the special master's term back in December. I believe it was the assistant attorney general for the criminal division that authorized that, but I haven't been able to obtain a definitive answer on who that was over the weekend. Has there been an internal delegation from the attorney general to allow the, you said the associate attorney general for the criminal division? Assistant attorney general. Assistant attorney general to make this decision? I'm not sure. I haven't been able to. Your point is, your point I take it is, your bottom line is, look, if there's anything here it's up to the district court, right? Well, it's up to the district court on a new complaint, right? I didn't say that. Your point is it's just not before us right now, right? That's right. Great. Thank you. All right. Thank you, Mr. Coppel. Oh, wait, I'm sorry. Judge Henderson, can I ask him one more question? Sure. Would you please explain the government's view of this section H.I. that was the subject of the other 20 H.A. letter? What is the government's view about what this is? Within 30 days after authorizing the payment, shall I submit a report to Congress on the payment of eligible claims, which suggests that payments have been made since January 1? And then when I asked counsel about the phrase, the amount of outstanding eligible claims, he said that didn't have anything to do with this. What do you think this provision means? So, subsection I requires a special master to report to Congress on the status of claims on a variety of data as of a given moment in time, 30 days after the deadline to authorize payments. That doesn't suggest that all have been issued by that date, but that's when the special master has to issue the report to Congress. And the numbers will, of course, be updated in the next report whenever that occurs. So, the way that the V.S.S.T. fund has operationalized this in the past is the first round of distributions, 30 days after the deadline to authorize payment, the special master sent a report to Congress. Payments had not yet issued. And so, after they did issue, the special master sent a supplemental report to Congress with updated numbers. Okay. Thanks again. Thank you. Sorry. Mr. Tolchin, why don't you take two minutes? Yeah, I'll try to stay within that. Very quickly, when I filed this case in the district court, there was no special master. They appointed a special master while the case was pending. That's what made the issue moot. If I'm correct that the special master's term expired while the appeal is pending, that puts us back to where we were when I filed this complaint. And I can understand if the court could address it de novo, the court could remand that issue, but I don't believe a new complaint is necessary. But it should call into question in the court's mind, I believe, what Mr. Capel is telling us about the position of the special master if, in fact, there is no special master. That's all I want to say on that point. I want to briefly talk about the effective date issue. The judge to tell the section and the amendments made by this section shall take effect on the date of the amendment of this act means that the change from 50 to 75 percent happens on the effective date of this act. Of course, we don't go back in time to people who got distributions in 2015 and give them money that they weren't entitled to by the allocation at that time. Why not? Why isn't that what the plain language requires? Because what the plain language requires is that distributions be made within by January 1st of each year. So those ships have already set sail. But by making the amendment that we've changed 50 to 75 percent. That would seem to cut against your point that we need to go back and make the 50 percent be 75 percent since 2015. The ship has already sailed. Payments have already been made. And so as the Clarification Act said, we're just going to start with a new rule in 2019 going forward. The problem with that is the thing that becomes effective on the effective date of the Clarification Act is a statute that says 75 percent of the funds forfeited are paid to the United States. No, we have to read whole statutes. We don't read statutes in little pieces. We have to read the whole statute. So under your theory, we would have to go back and start at least with Section 2 and say beginning on December 18, 2015, this is what should happen. If you read the statute as you want us to, we begin on December 18, 2015, and then we get to Romanette 2 and say beginning on December 18, 2015, 75 percent shall go. You can't just look at it in isolation. I agree that you have to read the whole statute, but when you have a Clarification Act that's changing one provision, you have to look at the thing that's being changed. And it did not say change 50 to 75 percent from the effective date of the Clarification Act. It was left saying 50 to 75 percent of the funds deposited after December 18, 2015. That's the law as it's written. If somebody beamed down from Mars and read the statute, that's what he would see from it. Without bringing in any other outside information, the statute itself says now 75 percent from 2015, not from the effective date of the Clarification Act. And I am a minute and a half. Mr. Goldman, why don't you take two minutes? Unmute yourself. Thank you, Your Honor. Thank you for the extra time. Again, I agree with what Mr. Tolchin just said. If you look at the statute, it talks about helping those who were in the fund before with a payment taking place in 2019 or 2020. It doesn't talk about recomputing the numbers as to what people received earlier. It doesn't talk about discouraging attorney fees earlier or any of those other consequences. What it talks about is gathering a sum of money so that people could have a meaningful compensation. In the past, people got 4.2 percent. This year, 9-11 victims got 0.76 percent, three-fourths of one percent. That's because there wasn't money moved as the statute said it should have. Mr. Koppel said that there isn't that fund of escrow money that you had thought you had referenced. Or if there is, it's so minuscule, it's not going to serve the function that you wanted to here. And so, to be clear then, your theory, since that money is not there, let's assume the government's accurate about that. It's not there. Okay. Then there's no third fund. Then the only place to get this differential is the general fund. Is that correct? I think the question the court is addressing is remedy. And I think based on Mr. Koppel's unknowns, the words likely spent, the words how much is in there, then the question is remand. And then that's the determination of the remedy would be within the district court. I'm just asking you. I don't understand that answer other than we don't get to say to district courts, we don't get to say go back and you figure out what to do next. You say, if we'd have to say whether they could take money out of the general fund or not, that's a pure legal question that this case seems to pose for us. I do not believe they can take funds out of the general fund. I believe that funds could be taken out of the funds that fines and the like. So if they can't get the money from the general fund, then they just can't do what the statute plainly says to do under your view. I do not believe they can take it from the general fund, but I believe there could be a judgment entered and it comes out of the funds from forfeitures and the like, which is the funds that are to be split off. Okay. Thank you. All right. Thank you, gentlemen. Madam Clerk, if you'd call the next case.
judges: Henderson, Tatel, Millett